IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| SUSANA A. ZENTENO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| | § | Civil Action No. 4:23-CV-00089-BJ |
| v. | § | |
| | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY | § | |
| ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Susana Zenteno ("Zenteno") seeks judicial review of a final adverse decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). Because the parties have consented to proceed before a magistrate judge, the undersigned has full authority under 28 U.S.C. § 636(c) to consider this appeal, including issuing a final judgment. For reasons stated herein, the decision of the Administrative Law Judge ("ALJ") is **REVERSED** and **REMANDED**.

## I. STATEMENT OF THE CASE

Zenteno filed this action pursuant to Sections 405(g) and 421(d) of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act ("SSA"). Zenteno filed her application on March 20, 2020, alleging that her disability began January 1, 2006. (Transcript ("Tr.") 22.) Zenteno was previously found disabled as of June 8, 2009, but was deemed no longer disabled in continuing disability review on March 15, 2018. (Tr. 26.) Zenteno's present claim was denied initially on May 22, 2020, and upon reconsideration on

1

December 21, 2021. (Tr. 22.) She subsequently requested a hearing before an ALJ on January 7, 2022. (Tr. 22.) On July 19, 2022, the ALJ held a hearing by telephone due to the "extraordinary circumstance" created by Covid-19. (Tr. 22.) The ALJ issued a decision on September 6, 2022, denying Zenteno's application for disability insurance benefits. (Tr. 37.) On November 30, 2022, the Appeals Council denied Zenteno's request for review, leaving the ALJ's September 6, 2022 decision as the final decision of the Commissioner in Zenteno's case. (Tr. 1–3.) Zenteno subsequently filed this civil action seeking review of the ALJ's decision.

## II.    STANDARD OF REVIEW

Disability insurance is governed by Title II, 42 U.S.C. § 421 *et seq.*, of the SSA and numerous regulatory provisions. *See* 20 CFR Pt. 404 (DIB). The SSA defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R § 404.1520(a)(4). First, the claimant must not be presently working at any substantial gainful activity. *Id.* § 404.1520(a)(4)(i). "Substantial gainful activity" is defined as work activity involving the use of significant and productive physical or mental abilities for pay or profit. *See id.* § 404.1510. Second, the claimant must have an impairment or combination of impairments that is severe. *Id.* § 404.1520(a)(4)(ii), (c); *see also Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392–93 (5th Cir. 2000). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the Listing of Impairments ("Listing"). 20 C.F.R. Pt. 404 Subpt. P, App. 1; 20 C.F.R.

§ 404.1520(a)(4)(iii), (d).[1]  Fourth, if disability cannot be found based on the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to her past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv), (f).  Fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity ("RFC"), age, education, and past work experiences.  *Id.* § 404.1520(a)(4)(v), (g); *Crowley v. Apfel*, 197 F.3d 194, 197–98 (5th Cir. 1999).  At steps one through four, the burden of proof rests upon the claimant to show he is disabled.  *Crowley*, 197 F.3d at 198.  If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing despite his existing impairments.  *Id.*  If the Commissioner meets his burden, it is up to the claimant to then show that he cannot perform the alternate work.  *See Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards, and whether the decision is supported by substantial evidence in the record as a whole.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988) (per curiam).  Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion.  *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001), *quoting Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000).  It is more than a mere scintilla, but less than a preponderance.  *Id.*  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision.  *Id.*  An ALJ's decision is not subject to reversal, even if there is substantial evidence in the record that would

---

[1] Before moving from the third to the fourth step of the inquiry, the Commissioner assesses the claimant's residual functional capacity ("RFC") to determine the most the claimant is able to do notwithstanding her physical and mental limitations.  20 C.F.R. § 404.1520(a)(4), (e).  The claimant's RFC is used at both the fourth and fifth steps of the five-step analysis.  *Id.* § 404.1520(a)(4).  At Step Four, the claimant's RFC is used to determine if the claimant can still do her past relevant work.  *Id.* § 404.1520(a)(4)(iv).  At Step Five, the claimant's RFC is used to determine whether the claimant can adjust to other types of work.  *Id.* § 404.1520(a)(4)(v).

have supported the opposite conclusion, so long as substantial evidence supports the conclusion that was reached by the ALJ. *Dollins v. Astrue*, No. 4:08-CV-503-A, 2009 WL 1542466, at *5 (N.D. Tex. June 2, 2009). This Court may neither reweigh the evidence in the record, nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if substantial evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Hollis*, 837 F.2d at 1383.

## III.   ISSUE

In her brief, Zenteno presents the following issue: whether the ALJ's RFC finding, which does not consider Zenteno's frequent hospitalizations, is supported by substantial evidence if it is not based on all relevant evidence in the record. (Pl's. Br. at 1).

## IV.   ALJ DECISION

On March 20, 2020, Zenteno filed her application for DIB, alleging that her disability began January 1, 2006. (Tr. 22.) In his September 6, 2022 decision, the ALJ found that there was no evidence submitted to support Zenteno's claim that she was disabled from January 1, 2006, through June 8, 2009. (Tr. 22, 26.) Zenteno had previously been found disabled on December 21, 2009, with an onset date of June 8, 2006, but her benefits ceased via her continuing disability review process on March 15, 2018. (Tr. 22.) Thus, the ALJ determined the relevant period for Zenteno's claim was from March 16, 2018, through the date of decision. (Tr. 22.) At Step One, the ALJ found that Zenteno "did not engage in substantial gainful activity during the period since March 16, 2018." (Tr. 25.) At Step Two, the ALJ concluded that Zenteno "had the following severe impairments: diabetes mellitus, hypertension, renal transplant, anemia of chronic kidney disease stage three, pancreas transplant, lumbar arthropathy, and bilateral shoulder arthropathy." (Tr. 25.) At Step Three, the ALJ found that Zenteno "did not have an impairment or combination

of impairments that met or medically equaled the severity of one of the listed impairments in 20

CFR Part 404, Subpart P, Appendix 1." (Tr. 26.)

To determine Zenteno's RFC, the ALJ considered all of Zenteno's impairments, singly and

in combination, including impairments that were not severe. (Tr. 25.) As to Zenteno's RFC, the

ALJ stated:

> After careful consideration of the entire record, I find that the claimant had
> the residual functional capacity to perform light work as defined in 20 C.F.R.
> 404.1567(b) except with additional limitations. The claimant was unable to climb
> ladders, ropes or scaffolds. The claimant was able to occasionally climb ramps and
> stairs, stoop, kneel, crouch, crawl and balance. The claimant needed to avoid
> exposure to hazards, such as unprotected heights or open flames. The claimant was
> able to frequently reach with the bilateral upper extremities.

(Tr. 27 (emphasis omitted).) At this step, the ALJ weighed Zenteno's statements concerning the

"intensity, persistence, and limiting effects" of her symptoms against her medical history. (Tr.

28.) At Step Four, the ALJ found that Zenteno had past relevant work as a warehouse worker but

that she could no longer perform that work because the requirements exceeded Zenteno's RFC.

(Tr. 35.) At Step Five, based upon the RFC determination and the testimony of a vocational expert

("VE"), the ALJ concluded that there were jobs—fingerprint clerk, price marker, or router—that

existed in significant numbers in the national economy that Zenteno could perform. (Tr. 35–36.)

Consequently, the ALJ found that Zenteno was not disabled. (Tr. 36.)

## V.   DISCUSSION

In her brief, Zenteno argues that the ALJ erred by failing to adequately address whether

Zenteno would be able to maintain her employment due to her history of frequent hospitalization.

(Pl.'s Br. at 1, 18.) In the VE's testimony, the ALJ asked whether an individual, "due to any of

the number of symptoms . . . would be absent from work or had to leave work early on an

unplanned, unscheduled basis, three times per month, would that individual be able to sustain the

type of work [the VE] identified." (Tr. 62.) The VE testified that such an individual would not be

able to sustain the work of a fingerprint clerk, price marker, or router. (Tr. 62.) At the end of the hearing, Zenteno's attorney referred to the medical evidence in the record that, he claimed, weighed in favor of Zenteno not being able to go back to work due to a high likelihood that she would exceed the absenteeism limit. (Tr. 63–64.)

A.    **Medical History Examined by the ALJ**

In the ALJ's determination of Zenteno's RFC, the ALJ referred to the following hospitalizations:

1) Zenteno presented to Medical City on May 20, 2018, with diarrhea, nausea, back pain, and vomiting. (Tr. 28; *see* Tr. 506.) On May 21, 2018, Zenteno was discharged after undergoing a physical examination and lab work. (Tr. 28; *see* Tr. 516.)

2) Zenteno presented to Medical City on September 4, 2018, with abdominal pain and dysuria. (Tr. 29; *see* Tr. 536.) Zenteno was diagnosed with a UTI and discharged on September 6, 2018. (Tr. 29; *see* Tr. 536–37.)

3) Zenteno presented to John Peter Smith Hospital ("JPS") on May 1, 2019, for a prescription refill, but also discussed an ulcer on her foot with the doctor. (Tr. 29; *see* Tr. 409.)

4) Zenteno presented to JPS on May 17, 2019, to establish care because she had lost her insurance. (Tr. 29; *see* Tr. 416.)

5) Zenteno presented to JPS on October 18, 2019, for a chronic kidney disease follow-up. (Tr. 29; *see* Tr. 420–21.)

6) Zenteno presented to Texas Health on March 26, 2020, with chemical burns on her knees that she believed had become infected. (Tr. 30; *see* Tr. 902.) After the doctor cared for her wound, Zenteno was discharged. (Tr. 30; *see* Tr. 906.)

7) Zenteno presented to Medical City on June 4, 2020, with a hernia with worsening abdominal pain, nausea, vomiting, and constipation. (Tr. 30; *see* Tr. 936.) Zenteno was scheduled for a follow-up for the hernia with JPS but claimed she could not last until that date due to the pain worsening. (Tr. 938.) Zenteno had a surgery consultation, she was given IV fluids and her constipation was treated, and she was subsequently discharged on June 7, 2020. (Tr. 938.)

8) Zenteno presented to JPS on July 7, 2020, for a follow-up for a hernia surgery that took place at JPS on June 29, 2020. (Tr. 31; *see* Tr. 1054.)

9) Zenteno presented to JPS on July 27, 2020, for another follow-up to her hernia surgery. (Tr. 31; *see* Tr. 1049.)

10) Zenteno presented to Medical City on May 26, 2021, with Covid pneumonia. (Tr. 31; *see* Tr. 2703.) Zenteno was put on 2 liters of oxygen and several medications during in-patient care and was subsequently discharged on May 29, 2021. (Tr. 31; *see* Tr. 2703.)

11) Zenteno presented to Medical City on April 11, 2022, with a rash on her face and arms. (Tr. 31; *see* Tr. 2686.) Zenteno was discharged the same day with Pepcid and steroid cream. (Tr. 31; *see* Tr. 2690.)

12) Zenteno presented to Medical City on May 2, 2022, with complaints of three weeks of abdominal pain and a chronic facial rash. (Tr. 31–32; *see* Tr. 4249.) She was kept in the hospital until she was discharged on May 4, 2022, while tests were run on her bowels. (Tr. 31–32; *see* Tr. 4249.)

13) Zenteno presented to Baylor Medical Center on May 21, 2022, with complaints of chills, abdominal pain, nausea, vomiting, and diarrhea. (Tr. 32; *see* Tr. 2818.) She received in-patient care until she was discharged on May 25, 2022, after she was treated for a UTI. (Tr. 32; *see* Tr. 2830–31.)

14) Zenteno presented to JPS on June 10, 2022, for a follow-up regarding knee pain that arose from a fall. (Tr. 32; *see* Tr. 4207.)

Regarding the above medical history, the ALJ frequently noted that the evidence did not support the "alleged severity of the claimant's complaints" and that "this evidence does not support the presence of any additional functional limitations." (Tr. 29–30, 31, 32.) While the ALJ referenced a "couple of [Zenteno's] inpatient hospitalizations in 2022," the ALJ concluded that "[Zenteno's] acute symptoms from those visits resolved, and the longitudinal record otherwise does not support a finding that she suffers from **chronic daily symptoms** that would render her incapable of sustaining work within the residual functional capacity." (Tr. 33 (emphasis added).) However, the ALJ erred by failing to consider a significant number of other hospital visits in the same year and from the relevant period (discussed below) in making his determination, and by failing to consider how the waxing and waning of Zenteno's symptoms would affect her ability to sustain work. (Tr. 33.)

7

**B.**     **Zenteno's Relevant Medical History**

In her brief, Zenteno points to the extensive medical evidence in the record dated between March 16, 2018, and the day of decision, September 6, 2022. (Pl.'s Br. at 2–14.) In relevant part, the medical history in the record shows that Zenteno was in the hospital more than three days out of a month thirteen times in the relevant period: twice in 2018, twice in 2020, five times in 2021, and four times in 2022. (Pl.'s Br. at 2–14.) The ALJ's discussion mentioned some visits in only six of those months. (Tr. 28–32.) The following is a detailed history of the relevant visits and durations:[2]

1) In May 2018, Zenteno was in Medical City for *three days*. (Pl.'s. Br. at 3; *see* Tr. 463, 506, 515.) Zenteno presented to Medical City with nausea, vomiting, and diarrhea. (Pl.'s Br. at 3; *see* Tr. 463.) A few days later, Zenteno returned to Medical City with diarrhea, nausea, back pain, and vomiting. (Pl.'s Br. at 3; *see* Tr. 28, 506.) The next day, Zenteno was discharged after undergoing a physical examination and lab work. (Pl.'s Br. at 3; *see* Tr. 28, 516.)

2) In September 2018, Zenteno was in Medical City for *three days*. (Pl.'s Br. at 3; *see* Tr. 29, 536.)[3] Zenteno presented to Medical City with abdominal pain and dysuria. (Pl.'s Br. at 3; *see* Tr. 29, 536.) Zenteno was diagnosed with a UTI and discharged. (Pl.'s Br. at 3; *see* Tr. 29, 536–37.)

3) In May 2020, Zenteno was in Baylor Medical Center for *three days*. (Pl.'s Br. at 7; *see* Tr. 3737.) Zenteno presented to Baylor Medical Center for diarrhea and abdominal pain. (Pl.'s Br. at 7; *see* Tr. 3737.) The hospital believed she had a UTI, and, due to her immunosuppressed state, she was admitted and received IV antibiotics and fluids. (Pl.'s Br. at 7; *see* Tr. 3737.) Zenteno was diagnosed with Klebs PNA UTI, improved on Rocephin, and was subsequently discharged with antibiotics. (Pl.'s Br. at 7; *see* Tr. 3737.)

4) In June 2020, Zenteno was in Medical City for *four days* and JPS for *four days*. (Pl.'s Br. at 5, 11; *see* Tr. 936, 1110.) Zenteno presented to Medical City with a ventral hernia with worsening pain, nausea, vomiting, and constipation. (Pl.'s Br. at 5; *see* Tr. 936.) Zenteno had been seen at Baylor Medical Center for her

---

[2] The following discussion includes only the unplanned visits during the months where Zenteno was in the hospital for three days or more on unplanned or unscheduled visits. Zenteno was in the hospital many more times than this over the previous five years for planned and unplanned visits, but those visits are irrelevant to the VE's testimony, which only mentioned three or more unplanned and unscheduled absences in a month. (Tr. 62.)

[3] Plaintiff's brief incorrectly lists the dates as September 6–8, 2018. The correct dates are September 4–6, 2018.

hernia and was scheduled for a surgery follow up at JPS, but the pain prevented her from waiting. (Tr. 938.) Her constipation was treated, and she showed improvement. (Pl.'s Br. at 5; *see* Tr. 938.) While at Medical City, Zenteno underwent consultation for immunosuppression management. (Tr. 30, 970.) Zenteno was discharged with a diagnosis of a partial small bowel obstruction (SBO) and was "counseled extensively" on the importance of following up with a hospital if her pain was irreducible. (Pl.'s Br. at 5; *see* Tr. 938.) A few days later, Zenteno presented to JPS with continuing pain from the hernia. (Pl.'s Br. at 11; *see* Tr. 1110.) Zenteno's hernia was able to be reduced by JPS, she was told to follow up in a week, and she was scheduled for surgery on June 29, 2020. (Pl.'s Br. at 11; *see* Tr. 1116.) On June 13, 2020, Zenteno presented to JPS with worsening abdominal pain from the hernia. (Pl.'s Br. at 11; *see* Tr. 1082.) Following treatment, Zenteno was discharged in stable condition on June 15, 2020. (Pl.'s Br. at 11; *see* Tr. 1101.) On June 29, Zenteno underwent surgery for her ventral hernia at JPS.[4] (Tr. 1067–69.)

5) In January 2021, Zenteno was in Medical City for ***three days***. (Pl.'s Br. at 5–6; *see* Tr. 2733, 4439.) Zenteno presented to Medical City with complaints of abdominal pain, diarrhea, dysuria, and nausea. (Pl.'s Br. at 5; *see* Tr. 2733.) She was diagnosed with a UTI and discharged with prescriptions for Tramadol and Keflex. (Pl.'s Br. at 5; *see* Tr. 2740–41.) Zenteno returned to Medical City a week later with complaints of acute abdominal pain and episodes of diarrhea. (Pl.'s Br. at 5; *see* Tr. 4439.) A renal ultrasound showed pyelocaliectasis and two simple cysts of the transplanted kidney. (Pl.'s Br. at 5; *see* Tr. 4439.) After treatment, Zenteno was discharged the next day. (Pl.'s Br. at 5–6; *see* Tr. 4439.)

6) In March 2021, Zenteno was in Baylor Medical Center for ***four days***. (Pl.'s Br. at 7–8; *see* Tr. 3628.) She presented to Baylor Medical Center with abdominal pain and associated diarrhea. (Pl.'s Br. at 7; *see* Tr. 3617.) Zenteno was diagnosed with acute kidney injury (AKI), which was resolved prior to her discharge. (Pl.'s Br. at 7; *see* Tr. 3629.) Zenteno was given a prescription for Tramadol and discharged on March 18, 2021. (Pl.'s Br. at 7–8; *see* Tr. 3629.)

7) In May 2021, Zenteno was in Baylor Medical Center for ***seven days*** and Medical City for ***four days***. (Pl.'s Br. at 6, 8; *see* Tr. 31, 2703, 3218, 3398.) On May 5, 2021, Zenteno presented to Baylor Medical Center for diarrhea that had been constant for two months, as well as abdominal pain. (Pl.'s Br. at. 8; *see* Tr. 3398.) She was diagnosed with AKI, diarrhea, and dehydration. (Tr. 3401.) An EGD and colonoscopy was performed on May 10, 2021, which demonstrated a large hiatal hernia. (Pl.'s Br. at 8; *see* Tr. 3411.) Zenteno's symptoms improved after trial of pancreatic enzymes, and she was subsequently discharged that same day. (Pl.'s Br. at 8; *see* Tr. 3411.) Two weeks later, Zenteno presented to Medical City with Covid pneumonia. (Pl.'s Br. at 6; *see* Tr. 2703.) Zenteno was initially on room air and then required

---

[4] This surgery is not counted in the four days Zenteno spent in JPS in June 2020 as it was a planned surgery and, thus, irrelevant to the VE's testimony.

oxygen, and she was subsequently started on several medications. (Tr. 2703.) She was discharged on May 29, 2021, with oxygen and antibiotics. (Pl.'s Br. at 6; *see* Tr. 2703.) On May 31, 2021, Zenteno presented to Baylor Medical Center with complaints of shortness of breath and substernal chest pain that had not gotten better since her visit to Medical City. (Pl.'s Br. at 8; *see* Tr. 3218–19.) She remained in Baylor Medical Center into June 2021. (Tr. 3230.)

8) In June 2021, Zenteno was in Baylor Medical Center for *three days*. (Pl.'s Br. at 8; *see* Tr. 3219.) Following admission at the end of May for continued pain from Covid pneumonia, Zenteno remained in Baylor Medical Center from June 1–3, 2021. (Pl.'s Br. at 8; *see* Tr. 3230.)

9) In October 2021, Zenteno was in Medical City for *five days*. (Pl.'s Br. at 6; *see* Tr. 4368.) Zenteno presented to Medical City with fatigue, fever, night sweats, chills, back/flank pain, and dysuria and frequency—symptoms similar to prior episodes of UTI. (Pl.'s Br. at 6; *see* Tr. 4368.) She was admitted for inpatient management of sepsis and UTI. (Pl.'s Br. at. 6; *see* Tr. 4368.) After treatment, she was discharged. (Pl.'s Br. at 6; *see* Tr. 4368–69, 4375.)

10) In January 2022, Zenteno was in Baylor Medical Center for *five days*. (Pl.'s Br. at 8–9; *see* Tr. 2981, 3130.) Zenteno presented to Baylor Medical Center with complaints of pain near the site of her transplanted kidney. (Pl.'s Br. at 8–9; *see* Tr. 3130.) After treatment, Zenteno was discharged. (Pl.'s Br. at 9; *see* Tr. 3135.) A few days later, Zenteno returned to Baylor Medical Center with complaints of pleurisy and weakness. (Pl.'s Br. at 9; *see* Tr. 2981.) She was admitted with sepsis from a UTI. (Tr. 2993.) After treatment, she was discharged. (Pl.'s Br. at 9; *see* Tr. 2993.)

11) In March 2022, Zenteno was in Medical City for *five days*. (Pl.'s Br. at 6; *see* Tr. 4304.) Zenteno presented to Medical City with a complaint of fevers, chills, night sweats, muscle aches, dysuria, and frequency. (Pl.'s Br. at 6; *see* Tr. 4304.) Her urinalysis was positive for a UTI, and her urine culture grew multidrug resistant organism ("MDRO") E. Coli. (Pl.'s Br. at 6; *see* Tr. 4304.) After treatment, she was discharged. (Pl.'s Br. at 6; *see* Tr. 4309.)

12) In April 2022, Zenteno was in Medical City, Baylor Medical Center, and JPS for *one day each*. (Pl.'s Br. at 6, 9, 12; *see* Tr. 31, 2686, 2951, 4183.) On April 11, 2022, Zenteno presented to Medical City with a rash on her face and arms. (Pl.'s Br. at 6; *see* Tr. 31, 2686.) Zenteno did not have any acute distress, and, thus, was discharged with Pepcid and steroid cream. (Pl.'s Br. at 7; *see* Tr. 31, 2690.) On April 15, 2022, Zenteno presented to Baylor Medical Center for an evaluation after a ground level fall in her home where she hit her head and knees. (Pl.'s Br. at 9; *see* Tr. 2951.) An x-ray showed that she had a left patellar fracture. (Pl.'s Br. at 9; *see* Tr. 2953.) Zenteno was provided with a knee immobilizer, crutches, and Norco, and subsequently discharged. (Pl.'s Br. at 9; *see* Tr. 2953–54.) Zenteno presented to JPS the next day for evaluation of (presumably) the same ground-level fall. (Pl.'s Br. at 12; *see* Tr. 4183.) She

was treated with Norco and placed in a knee immobilizer. (Pl.'s Br. at 12; *see* Tr. 4190.) She was discharged with prescriptions for Tylenol, Neurontin, and Robaxin. (Pl.'s Br. at 12; *see* Tr. 41.)

13) In May 2022, Zenteno was in Medical City for *three days*, JPS for *one day*, and Baylor Medical Center for *five days*. (Pl.'s Br. at 7, 9, 12; *see* Tr. 31–32, 2818, 4201, 4249.) On May 2, 2022, Zenteno presented to Medical City with complaints of abdominal pain and continuing pain from her fall in April 2022. (Pl.'s Br. at 7; *see* Tr. 31, 4249.) She was treated for constipation, AKI, SBO, and her facial rash, and discharged on May 4, 2022. (Pl.'s Br. at 7; *see* Tr. 31–32, 4249.) A week later, Zenteno presented to JPS because her knee immobilizer had not been keeping her knee extended successfully. (Pl.'s Br. at 12; *see* Tr. 4201.) She was put in a hinged knee brace and discharged. (Pl.'s Br. at 12; *see* Tr. 4203.) On May 21, 2022, Zenteno presented to Baylor Medical Center with complaints of chills, abdominal pain, nausea, vomiting, and diarrhea. (Pl.'s Br. at 9; *see* Tr. 32, 2818.) Zenteno's urinalysis was suggestive of UTI, and she was started on an antibiotic. (Pl.'s Br. at 9; *see* Tr. 32, 2831.) She was discharged on May 25, 2022. (Pl.'s Br. at 9; *see* Tr. 32, 2830.)

## C.   The Relevant Authorities

When determining whether a claimant can engage in substantially gainful activity, the ALJ must determine whether there are jobs which the claimant can obtain and perform, and "that the claimant can hold [those jobs] for a significant period of time." *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002) (quoting *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986)). Failure to apply the "*Singletary* standard" is a legal error, "and the Fifth Circuit has mandated that when the Commissioner 'has relied on erroneous legal standards in assessing the evidence, he must reconsider that denial.'" *Johnson v. Colvin*, No. 3:14-CV-04213-G, 2016 WL 791291, at *5 (N.D. Tex. Feb. 8, 2016) (quoting *Moore v. Sullivan*, 895 F.2d 1065, 1070 (5th Cir. 1990)). However, the ALJ is not required to make this determination explicit in every case. *Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003). Typically, the determination that a claimant can sustain employment is "subsumed in the analysis regarding the claimant's ability to obtain employment." *Frank*, 326 F.3d at 619. The ALJ must only determine the claimant's ability to sustain a job when "the claimant's physical ailment **waxes and wanes** in its manifestation of disabling symptoms," and

11

when the symptoms are "of sufficient frequency or severity to prevent the claimant from holding a job for a significant period of time." *Id.* (emphasis added).

For example, an ALJ is not required to determine whether a claimant can sustain a job when the claimant's ability to sustain a job is not at issue. *Id.* at 621. In *Frank*, the claimant, relying on *Singletary*, argued that the ALJ applied the incorrect legal standard when he did not make an express determination about the claimant's ability to sustain a job. *Id.* However, there was no evidence that the claimant would be unable to sustain a job, nor did the claimant make that claim. *Id.* In *Frank*, the Fifth Circuit clarified the *Singletary* holding, stating that the ALJ is only required to determine the claimant's ability to sustain employment when the claimant's ability to work and the ability to sustain work are separate issues. *Id.*

Furthermore, a lack of evidence that a claimant's hospitalizations were frequent enough or lasted long enough to raise concerns about absenteeism is insufficient to reverse and remand an ALJ's decision. *Boykin v. Kijakazi*, No. 4:21-CV-507-KPJ, 2023 WL 2572208, at *7 (E.D. Tex. Mar. 20, 2023). In *Boykin*, after a finding that the claimant was not disabled, the claimant appealed, claiming that, among other things, the ALJ had erred by not providing a function-by-function assessment of her various symptoms and their effect on her ability to sustain a job. *Boykin*, 2023 WL 2572208 at *6. The court upheld the ALJ's decision, in part because she had only been hospitalized once for her symptoms. *Id.* at *7. The court held that this evidence and a doctor's report that her symptoms waxed and waned did not alone prove that she could not sustain a job. *Id.* The court held that there was sufficient evidence to show that an analysis of the claimant's ability to sustain a job was not warranted. *Id.* at *8.

Conversely, a record of hospitalizations that exceed an absenteeism limit is sufficient evidence to reverse and remand an ALJ's decision when the ALJ has not addressed the claimant's

ability to sustain employment. *Johnson*, 2016 WL 791291 at *1. In *Johnson*, the claimant was hospitalized for her conditions eight times for a total of twenty-six days between August 2011 and May 2013. *Id.* At the administrative hearing, the VE testified that the jobs that the claimant was able to perform only allowed one day off a month, twelve days a year. *Id.* at *2. The court held that the claimant provided enough evidence to show that her condition waxed and waned in frequency or intensity, and, thus, the ALJ was required to consider whether the claimant was able to maintain employment. *Id.* at *5. Because the ALJ failed to apply the *Singletary* standard, the ALJ committed a legal error, and the court reversed and remanded the decision for reconsideration. *Id.*

Typically, as stated above, the ALJ's decision is granted great deference and will not be disturbed "unless the reviewing court cannot find substantial evidence in the record to support the Commissioner's decision or finds that the Commissioner made an error of law." *Leggett*, 67 F.3d at 564. Substantial evidence is that which is enough for a "reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992). The ALJ must consider all relevant evidence in the record: he cannot pick and choose that evidence which supports his conclusion. *Loza*, 219 F.3d at 393. Finally, substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

### D.   Analysis

Here, as in *Johnson*, there is sufficient evidence in the record that the claimant has a history of hospitalization that exceeds the VE's absenteeism limit. As discussed above, there was

13

extensive evidence in the record that Zenteno's ability to sustain work was a separate issue from her ability to obtain work. Zenteno was in the hospital more than three days out of the month for unplanned visits thirteen times over a four-year period. The VE testified that a worker would not be able to hold the jobs that Zenteno was qualified to perform if that worker had three unplanned absences in a month. (Tr. 62.) Although the ALJ considered Zenteno's medical history when making the RFC determination, the ALJ only considered whether Zenteno's medical record evidenced "chronic *daily symptoms* that would render her incapable of sustaining work within the residual functional capacity." (Tr. 33 (emphasis added).) Thus, the ALJ's failure to address the effect Zenteno's waxing and waning symptoms have on her ability to maintain employment is a legal error that requires reversal and remand of the ALJ's decision.

Further, unlike the claimant in *Boykin*, there is no evidence in the record that Zenteno's symptoms are resolved. While Zenteno had surgery to resolve the pain suffered from a ventral hernia in June 2020 (Tr. 1067–69,) doctors later observed small loops in her bowel and a new ventral hernia in May 2022. (Tr. 4255.) Additionally, despite treatment of her past UTIs, doctors have been unable to prevent Zenteno from developing new UTIs. (*See* Tr. 536–37, 2831, 2993, 2740–41, 3737, 4304, 4368–69.)

There is overwhelming evidence in the record in this case to show that Zenteno's symptoms wax and wane in their frequency and severity and, based on the frequency that her symptoms have flared up in the past, she would have exceeded the absenteeism limit set by the VE thirteen times in the relevant time period. Therefore, because the record as a whole does not contain substantial evidence to support a conclusory finding that Zenteno could sustain her employment, the ALJ was required to determine how Zenteno's hospital visits would affect her ability to sustain employment. Because the ALJ did not do so, reversal and remand is required.

## RECOMMENDATION

Based on the foregoing, the Commissioner's decision is **REVERSED** and **REMANDED**

for further administrative proceedings consistent with this order.

SIGNED September 27, 2023

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE